IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **HOWARD L. PICKETT, JR.,** | ) | |
|     Plaintiff | ) | Civil Action No. 2:20cv00036 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **KILOLO KIJAKAZI,**[1] | ) | By: PAMELA MEADE SARGENT |
| **Acting Commissioner of Social** | ) |     United States Magistrate Judge |
| **Security,** | ) | |
|     Defendant | ) | |

*I. Background and Standard of Review*

Plaintiff, Howard L. Pickett, Jr., ("Pickett"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows Pickett protectively filed applications for DIB and SSI on January 26, 2018, alleging disability as of July 1, 2018,[2] due to pain; gout; arthritis; high blood pressure; back problems; anxiety; and depression. (Record, ("R."), at 10, 42, 199-207, 223, 258.) The claims were denied initially and on reconsideration. (R. at 121-23, 129-44.) Pickett requested a hearing before an administrative law judge, ("ALJ"). (R. at 145.) A hearing was held on February 10, 2020, at which Pickett was represented by counsel. (R. at 34-58.)

By decision dated March 24, 2020, the ALJ denied Pickett's claims. (R. at 10-22.) The ALJ found Pickett met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2020. (R. at 12.) The ALJ found Pickett had not engaged in substantial gainful activity since July 1, 2018, the alleged onset date. (R. at 12.) The ALJ determined Pickett had severe impairments, namely gout, right knee osteoarthritis and mild thoracic degenerative disc disease, but he found Pickett did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12, 15.) The ALJ found Pickett had the residual

---

[2] Pickett initially reported his alleged onset date of disability as November 30, 2017. (R. at 199, 201.) However, at his hearing, Pickett amended his alleged onset date to July 1, 2018. (R. at 42.)

functional capacity to perform medium[3] work that required no more than frequent postural activities and frequent pushing and pulling with the right lower extremity. (R. at 16.) The ALJ also found that Pickett would be expected to be absent from work 12 days per year and be off task 10 percent of the workday.[4] (R. at 16.) The ALJ found Pickett was unable to perform any of his past relevant work. (R. at 20.) Based on Pickett's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Pickett could perform, including the jobs of a cleaner, a packer and a laundry worker. (R. at 21-22.) Thus, the ALJ concluded Pickett was not under a disability as defined by the Act, and he was not eligible for SSI and DIB benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2020).

After the ALJ issued his decision, Pickett pursued his administrative appeals, (R. at 288-89), but the Appeals Council denied his request for review. (R. at 1-5.) Pickett then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2020). This case is before this court on Pickett's motion for summary judgment filed July 20, 2021, and the Commissioner's motion for summary judgment filed August 19, 2021.

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2020).

[4] The vocational expert testified that individuals could be off task up to 10 percent of the workday and could be absent from work 12 days over a period of one year. (R. at 55.)

## II. Facts

Pickett was born in 1960, (R. at 37, 199, 201), which, at the time of his alleged onset date, classified him as a "person of advanced age," and at the time of the ALJ's decision, classified him as a person "closely approaching retirement age" under 20 C.F.R. §§ 404.1563(e), 416.963(e). He has two years of college education and specialized training in masonry. (R. at 37, 224.) Pickett has past work as a brick mason/laborer. (R. at 38-39, 54.) At his hearing, Pickett stated he had suffered with gout for 12 years and had experienced significant problems with it during the last years he worked. (R. at 43.) He stated he missed two to three days a week due to gout. (R. at 45.) Pickett stated he could stand and/or walk up to 20 minutes without interruption. (R. at 45.) He stated he would rest up to 15 minutes before getting back up on his feet. (R. at 45-46.) Pickett stated he sought treatment at Watauga Recovery Services for his addiction to pain medication.[5] (R. at 49-50.)

Robert Jackson, a vocational expert, was present and testified at Pickett's hearing. (R. at 54-57.) Jackson was asked to consider a hypothetical individual of Pickett's age, education and work history, who had the residual functional capacity to perform medium work that required no more than frequent postural activities and frequent pushing and pulling with his right lower extremity. (R. at 54.) He stated such an individual could not perform Pickett's past work, but other work existed in significant numbers such an individual could perform, including jobs as a cleaner, a packer and a laundry worker. (R. at 54-55.) Jackson then was asked to

---

[5] Pickett received suboxone treatment for opioid dependence from January 2018 through April 2018. (R. at 411-81.)

consider the same hypothetical individual, but who would be limited to light[6] work. (R. at 55.) He stated that such an individual could not perform Pickett's past work. (R. at 55.) Jackson also stated that Pickett's prior work had no transferrable skills. (R. at 55.) He stated the previously identified jobs would not be available should the individual be limited to lifting and carrying items weighing no more than 10 pounds frequently. (R. at 56.) Jackson further stated the previously identified jobs would be eliminated if the individual could not bend, stoop, squat or kneel even one-third of the workday. (R. at 57.)

In rendering his decision, the ALJ reviewed records from Dr. Robert McGuffin, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Jo McClain, Psy.D., a state agency psychologist; Dr. Catherine Howard, M.D., a state agency physician; Dr. D. Kevin Blackwell, D.O.; Dr. Eddie Brown, D.O.; Norton Community Hospital; Appalachia Family Health; and Wellmont Cardiology Services.

On July 7, 2016, Dr. D. Kevin Blackwell, D.O., examined Pickett at the request of Disability Determination Services. (R. at 382-86.) Dr. Blackwell reported Pickett did not appear to be in any acute distress; he was alert and cooperative; he had a good mental status; his gait was symmetrical and balanced; his shoulder and iliac crest heights were good and equal, bilaterally; he had tenderness in all joints and the lumbar musculature; his knees had swelling; his upper and lower joints had no effusions or obvious deformities, and they were normal in size, shape, symmetry and strength; he had good grip strength; his fine

---

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2020).

motor movement and skill activities of the hands were normal; his reflexes were normal; he had a negative Romberg test; and his proprioception was intact. (R. at 384-85.) Dr. Blackwell diagnosed gouty arthritis, by history; probable osteoarthritis, by history; history of hypertension; history of Hodgkin's lymphoma; and multiple joint arthralgias. (R. at 385.)

Dr. Blackwell opined Pickett could lift items weighing 20 pounds occasionally and 10 pounds frequently; he could sit up to four hours in an eight-hour workday; stand for up to one hour in an eight-hour workday; he would need to change positions every 15 minutes; he should avoid bilateral, overhead activities and bilateral operation of foot pedals; he could not crouch, crawl, squat or kneel; and he could not work at unprotected heights or perform repetitive and continuous stair climbing. (R. at 385.)

On July 6, 2018, x-rays of Pickett's thoracic spine showed mild scattered disc space narrowing and scattered degenerative spurring. (R. at 483.) That same day, x-rays of Pickett's right knee showed minimal degenerative changes. (R. at 485.)

On July 7, 2018, Dr. Eddie Brown, D.O., examined Pickett at the request of Disability Determination Services. (R. at 493-97.) Pickett stated he was filing for disability due to knee pain, secondary to gouty arthritis. (R. at 493.) He reported neck, low back and shoulder pain, mood changes, depression and difficulty sleeping, but stated he could perform his activities of daily living independently. (R. at 493-94.) On examination, Pickett was in no acute distress; he ambulated without assistance; he had a normal gait; he exhibited some obvious joint tenderness in his knees, but no signs of joint instability, inflammation or deformity;

he had good tone and full motor strength in all muscle groups; he had normal range of motion; he had full grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; he had no edema, cyanosis or erythema in his extremities; he had normal reflexes and sensation; he exhibited no muscle asymmetry, atrophy or involuntary movements; he had no structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint; he was cooperative; he did not appear depressed or anxious; he was able to communicate with no deficits; his recent and remote memory were intact; and he had good insight and cognitive function. (R. at 494-95, 497.) Dr. Brown diagnosed gouty arthritis of multiple joints. (R. at 495.) He noted Pickett could sit in no significant distress; he could walk and stand in the office; and he showed no signs of mood instability or concentration difficulty. (R. at 495.) Dr. Brown opined Pickett "unlikely" would be able to walk and/or stand for a full workday; he "may be" able to sit for a partial workday with allotted occasional breaks; he could lift and carry items weighing less than 10 pounds; and he should refrain from excessive bending, stooping and crouching. (R. at 495.)

On July 10, 2018, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, finding Pickett could perform medium work that required no more than frequent pushing and pulling with his right lower extremity. (R. at 68-69.) He found Pickett could frequently climb, balance, stoop, kneel, crouch and crawl. (R. at 68-69.) Dr. McGuffin indicated no manipulative, visual, communicative or environmental limitations. (R. at 69.)

Also on July 10, 2018, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Pickett did not have a medically determinable mental impairment. (R. at 65-66.)

On September 19, 2018, Dr. Catherine Howard, M.D., a state agency physician, completed a medical assessment, finding Pickett could perform medium work. (R. at 99-101.) She found Pickett could frequently climb, balance, stoop, kneel, crouch and crawl. (R. at 100.) Dr. Howard indicated no manipulative, visual, communicative or environmental limitations. (R. at 101.)

On September 20, 2018, Jo McClain, Psy.D., a state agency psychologist, completed a PRTF, finding Pickett had no limitations on his ability to understand, remember or apply information; to interact with others; to concentrate, persist or maintain pace; or to adapt or manage himself. (R. at 97-98.) McClain noted Pickett had received treatment for opioid dependence and complained of emotional distress, but his mental status remained intact. (R. at 98.)

On October 30, 2018, Pickett presented to the emergency department at Norton Community Hospital for complaints of rib and foot pain. (R. at 556-71.) He reported his pain started when he was pulling and lifting blocks. (R. at 556.) Pickett had a steady gait; he had full range of motion; and he had intact circulation, movement and sensation. (R. at 560.) X-rays of Pickett's chest and ribs were normal. (R. at 553-54.) An ultrasound of Pickett's right lower extremity was normal. (R. at 555.) Pickett was diagnosed with gout. (R. at 563.)

On December 3, 2018, Pickett established care at Appalachia Family Health. (R. at 500-10.) Pickett reported shortness of breath on exertion; swelling in his ankles; back and joint pain; and depression. (R. at 505-06.) Jody Willis, F.N.P., a family nurse practitioner, reported Pickett was in no acute distress; he had a normal gait; his left elbow was tender with mild erythema; he was neurologically intact; he

had appropriate judgment and good insight; his recent and remote memory were intact; and he had a euthymic mood and appropriate affect. (R. at 506-07.) Willis diagnosed pain in unspecified joint and idiopathic gout, multiple sites. (R. at 507.) That same day, Pickett saw Crystal Burke, L.C.S.W., a licensed clinical social worker at Appalachia Family Health, for complaints of depression. (R. at 500-03.) Pickett reported stressors at home, including financial stressors, and feeling worthless due to his inability to work. (R. at 500.) Burke reported Pickett had a dysphoric mood and affect; he made adequate eye contact; his thought process was intact; he had no paranoia or delusions; and his judgment and insight were good. (R. at 502.) Burke diagnosed major depressive disorder, single episode, unspecified. (R. at 502.)

On December 12, 2018, Pickett saw Willis and reported his gout had improved. (R. at 511-16.) He stated he was feeling better, and he denied joint pain, stiffness and limitations of joint movement; muscle weakness; depression; and anxiety. (R. at 511, 513.) It was noted Pickett had frequent episodes of gout, but he had not been on medication. (R. at 511.) Willis reported Pickett had a normal gait; he was neurologically intact; he had appropriate judgment and good insight; his recent and remote memory were intact; and he had a euthymic mood and appropriate affect. (R. at 513.) His diagnosis remained unchanged. (R. at 514.)

On June 6, 2019, Pickett saw Lisa Muncy, N.P.-C., a certified nurse practitioner with Appalachia Family Health, and reported he was "doing good" despite being out of medication since January. (R. at 523-28.) He reported mild shortness of breath with exertion and chronic joint pain in his knees, toes and fingers. (R. at 523.) He denied anxiety and depression. (R. at 523.) Pickett stated his problems were fairly controlled with his treatment regimen. (R. at 523.) Muncy

reported Pickett had a normal gait; he had appropriate judgment and good insight; and he had a euthymic mood and appropriate affect. (R. at 525.) Pickett was diagnosed with idiopathic gout, unspecified; and tachycardia, unspecified. (R. at 526.)

On August 14, 2019, Pickett was seen at Wellmont Cardiology Services for evaluation of asymptomatic, mild sinus tachycardia. (R. at 572-74.) It was noted Pickett recently retired from mason work and was not very active in retirement, but he had no issues with performing his activities of daily living, yard work and shopping. (R. at 572.) Pickett was diagnosed with sinus tachycardia, chronic, mild and remote normal thyroid function tests and echocardiogram. (R. at 574.) Pickett did not require further cardiology evaluation or management. (R. at 574.)

On December 31, 2019, Pickett saw Muncy and reported a gout "flare-up" in his right foot and joint pain. (R. at 619-23.) He stated he was doing okay, and he denied joint stiffness and limitations of joint movement; muscle pain and weakness; depression; and anxiety. (R. at 619, 621.) Pickett's gait had a slight limp; he had appropriate judgment and good insight; and he had a euthymic mood and appropriate affect. (R. at 621.) Muncy diagnosed idiopathic gout, unspecified; restless leg syndrome; and elevated blood pressure without diagnosis of hypertension. (R. at 621.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).

This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Pickett argues the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-5.) Pickett argues the ALJ erred by rejecting the opinions of Dr. Blackwell and Dr. Brown and by relying on the opinions of the state agency physicians. (Plaintiff's Brief at 5.) Pickett contends the ALJ should have applied Rule 201.04[7] of the Medical-Vocational Guidelines, 20

---

[7] Rule 201.04 of the Grids applies to individuals limited to sedentary work. Based on my subsequent findings, I find this argument is moot.

C.F.R. Part 404, Subpart P, Appendix 2, ("the Grids"), to find him disabled. (Plaintiff's Brief at 5.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2020) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[8]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3)

---

[8] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2) (2020). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. §§ 404.1513(a)(5), 416.913(a)(5) (2020).

relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. §§ 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2020) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2020).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2020).[9] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. §§ 404.1520c(b)(2),

---

[9] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

416.920c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. §§ 404.1520c(b)(2)-(3), 416.920c(b)(2)-(3) (2020).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. §§ 404.1520c(b)(3), (c)(3)-(5), 416.920c(b)(3), (c)(3)-(5).

Pickett argues the ALJ erred by improperly determining his residual functional capacity by rejecting the opinions of Dr. Blackwell and Dr. Brown. (Plaintiff's Brief at 4-5.) The ALJ found Pickett had the residual functional capacity to perform medium work that required no more than frequent postural activities and frequent pushing and pulling with the right lower extremity. (R. at 16.) The ALJ also found Pickett would be expected to be absent from work 12 days per year and be off task 10 percent of the workday. (R. at 16.) A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2020). The residual functional capacity assessment is based on all the relevant evidence, including the

medical records, medical source opinions and the individual's subjective allegations and description of his own limitations. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

In making his residual functional capacity finding, the ALJ stated he found the opinions of Dr. Brown and Dr. Blackwell "unpersuasive." (R. at 17-19.) Dr. Brown opined it was "unlikely" Pickett would be able to walk and/or stand for a full workday and might be able to sit for a partial workday with allocated occasional breaks; he would be limited to lifting and carrying items weighing less than 10 pounds; and he should avoid excessive bending, stooping and crouching. (R. at 495.) The ALJ explained that Dr. Brown's opinion was unpersuasive because it was vague in terms of Pickett's standing, walking, bending, stooping and crouching limitations. (R. at 18.)

Concerning supportability, the ALJ stressed that Dr. Brown's own examination findings failed to corroborate a limitation to lifting 10 pounds maximum. (R. at 18.) For example, he reported Pickett had full motor strength, bilaterally, in all muscle groups, normal neurological findings and no muscle atrophy. (R. at 495.) As noted by the ALJ, Dr. Brown found that, while Pickett exhibited some joint tenderness in his knees, he showed no signs of joint instability, inflammation or deformity. (R. at 494-95.) He found Pickett had a normal gait and ambulated without assistance; he had good tone and full motor strength in all muscle groups; he had normal range of motion; he had full grip strength with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; he had normal reflexes and sensation; he exhibited no muscle asymmetry, atrophy or involuntary movements; and he had no structural deformity, effusion, periarticular swelling, erythema, heat or swelling of any joint. (R. at 494-

95, 497.) The ALJ also pointed out Dr. Brown's finding that Pickett could sit in no significant distress, walk and stand while in the office, and he possessed adequate fine motor movements, dexterity, and ability to grasp objects, bilaterally. (R. at 18, 495.)

Concerning Dr. Brown's lack of consistency with the rest of the record, the ALJ recognized Pickett's complaints of intermittent gout flares and chronic joint pain in his knees, toes and fingers, but was persuaded by the other evidence showing Pickett was not always medication compliant, he rated his daily pain as, typically, three to four out of 10, and he could perform daily activities including yard work and shopping. (R. at 18, 511, 523, 572.) In July 2018, Pickett had joint tenderness in his knees, but he showed no signs of joint instability, inflammation or deformity. (R. at 495.) In December 2018, Picket had tenderness in his left elbow with mild erythema. (R. at 506.) Otherwise, Pickett's examinations showed, generally, normal findings, including a normal gait;[10] full range of motion; good tone and full motor strength in all muscle groups; and intact circulation, movement and sensation. (R. at 384-85 495, 497, 506, 525, 560.) In addition, x-rays of Pickett's thoracic spine showed mild scattered disc space narrowing and scattered degenerative spurring, and right knee x-rays showed minimal degenerative changes. (R. at 483, 485.) An ultrasound of Pickett's right lower extremity was normal. (R. at 555.)

The ALJ found Dr. Blackwell's opinion was "not persuasive," as it was remote to the amended alleged onset date. (R. at 19.) In 2016, Dr. Blackwell

---

[10] On one occasion, Pickett's gait exhibited a slight limp. (R. at 621.)

opined Pickett could not perform the demands of even sedentary[11] work. (R. at 385.) The ALJ found this opinion was not persuasive for two reasons. (R. at 19.) First, the ALJ explained that Dr. Blackwell's opinion was too remote to be relevant, as it was issued two years before Pickett's amended alleged onset date. (R. at 19.) Second, in explaining why the opinion was not persuasive, the ALJ found it was inconsistent with the record during the relevant period under consideration. (R. at 19.) He again relied on the record evidence showing typically normal physical examination findings, as well as the x-rays showing minimal degenerative knee changes in the medial and patellofemoral joint compartments, but no significant joint effusion and mild findings in the thoracic spine. (R. at 19, 485.) The record shows Pickett routinely denied joint stiffness and limitations of joint movement and muscle pain and weakness. (R. at 511, 513, 621.) He reported improvement with medication, stating his pain was controlled with his treatment regimen. (R. at 511, 523, 619.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ found the findings of Drs. McGuffin and Howard to be "fairly persuasive," with Dr. McGuffin's finding slightly more persuasive than that of Dr. Howard. (R. at 18.) These state agency medical consultants reviewed Pickett's file and concluded that he could perform a range of medium work with frequent postural activities, and Dr. McGuffin additionally found Pickett was limited to frequent pushing and pulling with the right lower extremity. (R. at 68-69, 100-01.)

---

[11] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally, and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2020).

The ALJ considered Drs. McGuffin's and Howard's findings and found them consistent with the record, which showed Pickett generally had normal physical examination findings and symptom improvement with medication.

Based on this, I find substantial evidence exists to support the ALJ's consideration of the medical evidence and his residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:   March 8, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE